**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| ANDREW NAMIKI ROBERTS ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:18-cv-00125-HG-KSC |
| v. ) | |
| ) | |
| SUSAN BALLARD, in her Official ) | |
| Capacity as the Chief of Police of Honolulu ) | |
| County and RUSSELL SUZUKI, in his ) | |
| Official Capacity as the Attorney General ) | |
| of the State of Hawaii and AL CUMMINGS ) | |
| in his Official Capacity as the State Sheriff ) | |
| Division Administrator ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COMES NOW the Plaintiff, ANDREW NAMIKI ROBERTS, ("Plaintiff"), by and through his undersigned counsel, and complains of the Defendants as follows:

### I.  PARTIES

1. Plaintiff Andrew Namiki Roberts is an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United Kingdom and a legal permanent resident of the United States.

2. Defendant Susan Ballard is the Chief of Police of Honolulu County. Defendant Ballard is sued in her official capacity and is responsible for the administration and enforcement of Hawaii's and Honolulu County's customs, policies, practices and laws related to the State of Hawaii's ban on stun guns and/or electronic arms within Honolulu County. Defendant Ballard may be served at the 801 S Beretania St, Honolulu, HI 96813.

3. Defendant Russell Suzuki is the Attorney General of the State of Hawaii and is sued in his official capacity and is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii's ban on stun guns and/or electronic arms. Defendant Suzuki may be served at the Office of Attorney General located at 425 Queen St, Honolulu, Hawaii 96813.

4. Defendant Al Cummings is sued in this official capacity as State Sheriff Division Administrator Defendant Cummings is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii's ban on stun guns and/or electronic arms. Defendant Cummings may be served at the Department of Public Safety Sherriff's division located at 1177 Alakea Street, Room #418, Honolulu, Hawaii 96813.

## II.   JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.   STATEMENT OF FACTS

### a. The Second Amendment

7. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

8. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016).

9. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

10. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

11. Under the Second Amendment, the Defendants retains the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

12. Given the decision in *Heller*, Defendants may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

13. In a recent Fifth Circuit Court of Appeals case, the Fifth Circuit cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:

> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

*Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

14. Many other jurisdictions have already found complete bans on the ownership of electric arms is unconstitutional post-*Heller*. *See People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons), *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. Nov. 16, 2016) Doc. No. 30 (consent decree where the Court found New Jersey's complete ban on electric arms is unconstitutional), ("Pursuant to the holdings in *Heller, McDonald and Caetano*, N.J. Stat. Ann . § 2C:39- 3(h), to the extent this statute outright prohibits, under criminal penalty, individuals from possessing electronic arms, is declared unconstitutional in that it violates the Second Amendment to the United States Constitution and shall not be enforced"); *See, Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); *Ford v. City of New Orleans*, No. 2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20 (stipulating that the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that decriminalized possession of stun guns); *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the court that the City Council passed an

emergency ordinance eliminating all restrictions on ownership and possession of electronic weapons for personal defense); *Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) (striking Mass. ban on stun guns).[1]

15. Mr. Roberts is bringing an as-applied and facial challenge to the applicable Hawaii laws which prevent him from owning and carrying electric arms.

16. He seeks an injunction preventing enforcement of the applicable Hawaii laws against himself and declaratory relief.

17. Additionally, he seeks an injunction preventing enforcement of the applicable Hawaii laws as to all other law-abiding citizens.

### b. Stun Guns

18. Stun guns are arms in common use for self-defense by civilians as well as by law enforcement.

19. Tasers are a type of stun gun manufactured and sold by Axon (formerly known as Taser International).

20. A Taser is an electronic control device ("ECD") that uses replaceable cartridges containing inert, compressed nitrogen to fire two small probes that are attached to insulated conductive wires. In the models generally marketed to non-law enforcement persons, the conductive wires are 15 feet (4.5 meter) in length.

21. Taser models generally marketed to law enforcement agencies use conductive wires with lengths up to 25 feet in length.

---

[1] Since *Caetano*, electronic arms bans in Philadelphia, Pennsylvania; Tacoma, Washington and Westminster, Maryland were also rescinded. See https://www.phillymag.com/news/2017/10/24/stun-guns-legal-philadelphia/; http://www.carrollcountytimes.com/news/westminster/ph-cc-westminster-stun-gun-ban-discussion-20170523-story.html; http://www.thenewstribune.com/news/politics-government/article158619749.html.

22. The probes are designed to penetrate the clothing of an attacker and imbed in the attacker's skin. Electrical energy is sent over the wires into the probes. The charge is transmitted between the two probes and is designed to disrupt the sensory and motor functions to inhibit muscular control of an attacker.

23. With a Taser exposure, the attacker is momentarily incapacitated to allow the person attacked to escape and call for law enforcement assistance, or in the case of a law enforcement officer, to allow for the apprehension of the suspect without further risk of injury to the officer or the suspect.

24. The Taser's electronic charge lasts from five to thirty seconds depending on whether the civilian or the law enforcement model is employed.

25. The most commonly employed civilian Taser is a one-shot device with a 30 second charge. Once fired the device can still be used as a direct contact stun device in the event of a missed shot or in the event of multiple assailants.

26. Axon also manufactures Taser devices having the capacity for multiple shots. These multiple shot devices are commonly used by law enforcement personnel in the performance of their duties.

27. Tasers have several advantages over other non-lethal means of self-defense, such as self-defense sprays or contact weapons.

28. First, self-defense sprays must be administered generally within several feet of an assailant while a civilian model Taser can be deployed within 15 feet. The closer distance the assailant must be to a potential victim for the victim to employ a self-defense spray increases the danger to the potential victim. For example, it is generally recognized by law enforcement that an assailant wielding a contact weapon such as a knife or a club can be a lethal threat at distances

of 21 feet or closer.  *See* Dennis Tueller*, How Close is Too Close*, Police Policies Study Council, available at http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (originally published in the March 1983 Edition of SWAT Magazine).

29. Second, pepper sprays can often be ineffectual against highly intoxicated or highly agitated assailants. *See generally* Steven M. Edwards, et al., *Evaluation of Pepper Spray*, National Institute of Justice, U.S. Dept. of Justice, Office of Justice Programs, Research in Brief (February 1997), available at https://www.ncjrs.gov/txtfiles/162358.txt.  Tasers, on the other hand, when effectively employed will likely stop an attack from an intoxicated or mentally disturbed attacker.

30. Third, for optimum effect, self-defense sprays should be deployed at the face of the attacker, which is a small target.  The Taser is most effective when deployed at other larger parts of the body of the attacker.

31. Fourth, self-defence sprays can end up being blown back at the victim if used in a windy environment, resulting in incapacitating the victim rather than the attacker.  This is not an issue with a Taser device.

32. In the County of Honolulu, pepper spray is limited to "spray cans designed to fit into a handbag or a pants pocket". *See* Article 37 Sections 41-37.1 of the Revised Ordinance of Honolulu.

33. Spray cans larger than this are prohibited and thus banned for self-defense *See* Article 40-2.3 of the Revised Ordinance of Honolulu.

34. Thus, larger spray cans which would be better for self-defense are prohibited and banned.

7

35. Likewise, Tasers have advantages over the variety of contact weapons as well such as police type batons or knives. Allowing an attacker too close to contact distance creates a high degree of danger to a potential victim.

36. Contact weapons can also be more difficult for persons of lesser strength to deploy, compared to a Taser.

37. Moreover, use of any contact weapon, such as a knife or club, carries a high degree of risk of death or serious bodily harm to the assailant, whereas risk of death or serious bodily harm from a Taser or stun gun is minimal.

38. On a related note, given that use of a knife or club qualifies as the use of deadly force, an individual using a knife or club to defend against a criminal attack, has a high legal standard to meet to sustain a claim self-defense.

39. Tasers have been widely used by law enforcement agencies throughout the United States and the world. More than 18,000 law enforcement agencies use the devices.

40. Studies have shown Tasers to reduce injuries to both law enforcement officers and to suspects. The United States Department of Justice found that Tasers result in fewer injuries to suspects and officers than all other means of subduing suspects.

41. In the event of deployment of a civilian Taser, the device releases some 24 small confetti like tags called AFIDs which are packed into the firing mechanism. When the Taser cartridge is engaged, the AFIDs fly out of the Taser and scatter around the area where the device was utilized.

42. The term AFID stands for Anti Felon Identification. Taser utilizes AFIDs to deter criminal misuse of its product. Taser can trace the purchaser of the device from data contained on an AFID.

43. Tasers and other electronic weapons are in common use for self-defense. The Michigan Court of Appeals found that "Hundreds of thousands of Tasers and stun guns have been sold to private citizens," *People v. Yanna*, 297 Mich. App. 137, 144, 824 N.W. 2d 241, 245 (2012). Concurring in the *per curiam* reversal of the Massachusetts Supreme Judicial Court's upholding of a ban on stun guns, Justice Alito stated, "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defence across the country." *Caetano v. Massachusetts*, 136 S. Ct. 1027 (March 21, 2016) (Alito, J., concurring).

44. Other forms of stun guns that do not deploy probes are also used for self-defense.

45. These stun guns range from contact weapons which require the user to come in close vicinity to ranged weapons like the Taser.

46. Depending on the situation there are benefits to deploying a Taser in drive stun mode or a deploying a stun gun over deploying the Taser probes.

47. The most notable one is if a person is surprised and attacked at extreme close range i.e. in a grappling situation, a contact stun gun or a Taser in drive stun mode may be more effective than deploying the Taser probes because it is easier to deploy at this distance.

48. At this range, contact stun guns also have an advantage over other arms.

49. A baton requires space to swing which is unavailable at close range.

50. A knife will only subdue an attacker if it scores a hit on a vital spot whereas the electric shock of a stun gun can subdue an attacker with a strike on any part of the body. Additionally, usage of knives can cause severe bodily injury and even death.

51. A stun gun does not require strength to use where as both knives and batons require a significant amount of upper body strength to use effectively

52. At extremely close range, sprays are hard to deploy and can impact both the attacker and the person deploying the spray.

53. There are more than 5 million stun guns legally in use by civilians in the United States.

54. Electric arms are designed for use during self-defense against a human attacker.

55. Electric arms' primary function and purpose is to be used as a nonlethal form of self-defense against a human attacker.

### c. State of Hawaii Law.

56. H.R.S. § 134-1 defines an electric arm as follows "'Electric gun' means any portable device that is electrically operated to project a missile or electromotive force. It does not include any electric livestock prod used in animal husbandry and any automatic external defibrillator used in emergency medical situations."

57. H.R.S. § 134-16 provides that it "shall be unlawful for any person, including a licensed manufacturer, licensed importer, or licensed dealer, to possess, offer for sale, hold for sale, sell, give, lend, or deliver any electric gun.

58. H.R.S. § 134-51 provides that "any person, not authorized by law, who carries concealed upon the person's self or within any vehicle used or occupied by the person or who is found armed with any … deadly or dangerous weapon shall be guilty of a misdemeanor".

59. Dangerous and deadly weapons are "one designed primarily as a weapon or diverted from normal use and prepared for combat". *State v. Giltner*, 56 Haw. 374, 537 P.2d 14 (1975). As electric arms are designed primarily for use as a self-defense weapon they fall within, H.R.S. § 134-51's definition of a deadly or dangerous weapon.

60. Thus, it is unlawful under H.R.S. § 134-51 to be armed with a stun gun. So even if H.R.S. § 134-16 were enjoined Mr. Roberts right to self-defense would still be materially interfered with by this statute as well.

61. H.R.S. § 134-51 does not require that weapons be "concealed" within a car or while carrying it in order to violate the statute. *See State v. Ogata*, 572 P.2d 1222, 1223 (Haw. 1977) ("HRS § 134-51 may be violated by the carrying of deadly or dangerous weapons, *whether concealed or unconcealed")*

62. Thus, even if H.R.S. § 134-16 is enjoined, Mr. Roberts would still be unable to carry an electric arm. And he could never arm himself with an electric gun due to H.R.S. § 134-51.

63. Thus, the State of Hawaii outlaws the private possession and carry of electric arms within the state.

64. A handgun carry permit issued pursuant to H.R.S. §134-9 is the only means for a private citizen to carry a firearm in Hawaii.

65. H.R.S. §134-9 only allows for permits to be issued to U.S. citizens other than an exception for foreign officials which does not apply to Plaintiff Roberts.

66. Thus, Mr. Roberts has no means to carry a firearm for self-defense in the State of Hawaii.

### d. Plaintiff Andrew Namiki Roberts.

67. Plaintiff Namiki Roberts desires to purchase an electric arm for self-defense and other lawful purposes in his home, business, whilst traveling between these locations and in all other locations.

68. His primary mode of transportation is via car.

69. Plaintiff Namiki Roberts is unable to apply for a handgun carry permit because he is not a citizen.

70. Plaintiff Namiki Roberts is self employed as a photographer.

71. While conducting business Plaintiff Namiki Roberts is in possession of highly expensive pieces of equipment and various sums of money.

72. Plaintiff Namiki Roberts currently wishes to purchase a stun gun or Taser for lawful self-defense and does not solely due to Hawaii law.

73. Plaintiff Namiki Roberts has never been convicted of a crime that would disqualify him from firearms ownership under either Hawaii or federal law.

74. Plaintiff Namiki Roberts has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaii or federal law.

75. Plaintiff Namiki Roberts does not abuse alcohol or use illegal drugs.

76. Plaintiff is aware that there are significant and adverse legal, financial, social and psychological ramifications of using deadly force to defend against a home invasion or personal attack. He is aware that even where use of deadly force is justified, a victim forced to use deadly force may be taken into police custody, arrested and prosecuted. He is aware that he would likely have to go to the expense of hiring an attorney to protect his rights in the criminal justice system. He is aware that he would be at the mercy of police, prosecutors and jurors who will have weeks or months to second guess a decision to use deadly force made in seconds in the face of a threatened attack.

77. Plaintiff is aware that even where use of deadly force is justified, a victim may be sued by the perpetrator if the perpetrator survives, or by the perpetrator's family, if the perpetrator does not survive. The victim may have to go to the expense of hiring an attorney to defend the

civil proceeding and will be at the mercy of a jury second guessing in the comfort of a jury room the decision to use deadly force made in a second in the face of an attack.

78. Plaintiff is aware that persons forced to use deadly force in their defense may likely suffer one or more types of psychological distress.

79. Plaintiff is aware that persons forced to use deadly force in their defense will likely suffer from the withdrawal and isolation of friends and families, especially if their use of force results in the death of the perpetrator.

80. Plaintiff is aware that persons forced to use deadly force in their defense will likely suffer from one or more manifestations of Post Violent Event Trauma. These manifestations can include sleep disturbance including sleeplessness or nightmares, substance abuse, depression or malaise, appetite disturbance, social withdrawal or social ostracism, aggression or avoidance syndrome and flashbacks.

81. Plaintiff is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend himself or his home against a violent criminal attack.

82. Plaintiff would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

83. Plaintiff Namiki Roberts has a 9-year-old daughter who resides in the same residence as himself

84. Plaintiff is required per HRS § 134-10.5 to keep all firearms locked up to prevent un-authorized access by a minor.

85. Plaintiff due to HRS § 134-10.5 is unable to adequately use his firearms within his own home for self-defense.

86. Plaintiff would desire to possess a Taser and stun gun to have readily accessible within the home for self-defense and protection of his family.

87. Plaintiff Namiki Roberts has previously contacted the Honolulu Police department to enquire about the legality of tasers and electric weapons.

88. Plaintiff Namiki Roberts was informed that the Honolulu Police Department was enforcing the state law as written.

89. Plaintiff Namiki Roberts desires to purchase a Taser Pulse. However, Plaintiff fears prosecution for possessing and carrying a Taser.  *See* Exhibit "1."

90. But for Hawaii law, Plaintiff would acquire, possess, carry and where appropriate use a Taser and/or stun gun to protect himself, his home, his family and business.

## COUNT I

### U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

91. The Defendants prohibit Plaintiff from acquiring, possessing, carrying and using a defensive arm in common use, i.e., an electric arm.  As such it violates Plaintiff's Second Amendment rights.

92. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiff in this action, damaging Plaintiff in violation of 42 U.S.C. § 1983. Plaintiff is therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## COUNT II

## (DECLARATORY JUDGMENT)

93. Plaintiff repeats and realleges the allegations of the paragraphs 1-89 as if set forth herein.

94. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

95. Absent a declaratory judgment, there is a substantial likelihood that Mr. Roberts will suffer irreparable injury in the future.

96. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

97. This Court possesses an independent basis for jurisdiction over the parties.

98. A judgment declaring that the State of Hawaii's ban on the ownership and carry of electric arms violates the Second Amendment will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

99. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiff in this action, damaging Plaintiff in violation of 42 U.S.C. § 1983. Plaintiff is therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing HI Rev Stat § 134-16 and HI Rev Stat § 134-51 ban on the acquisition, possession, carrying or use of Tasers and other electronic arms as applied to Mr. Roberts and additionally against other similarly situated law abiding persons;

2. An order declaring that HI Rev Stat § 134-16 is unconstitutional and violates the Second Amendment to the United States Constitution as applied to Mr. Roberts and facially;

3. An order declaring that HI Rev Stat § 134-51 is unconstitutional and violates the Second Amendment to the United States Constitution as applied to Mr. Roberts and facially to the extent it prohibits him from keeping within a vehicle, carrying and arming himself with an electric gun.

4. An order declaring HI Rev Stat § 134-16 unenforceable as applied to Mr. Roberts and facially;

5. An order declaring HI Rev Stat § 134-51 and other applicable Hawaii law unenforceable as applied to Mr. Roberts and facially to the extent it prohibits using, keeping, possession within a vehicle, carrying, bearing and arming oneself with electric arms or alternatively a declaration that HI Rev Stat § 134-51 does not apply to electric arms;

6. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

7. Damages to be determined at trial;

8. Such other Declaratory relief consistent with the injunction as appropriate; and

9. Such other further relief as the Court deems just and appropriate.

Dated: May 21st, 2018.

                Respectfully submitted,

                **ANDREW NAMIKI ROBERTS**

                /s/ Alan Beck
                Counsel for Plaintiff

                Alan Alexander Beck
                Law Office of Alan Beck
                2692 Harcourt Drive
                San Diego, CA  92123
                (619) 905-9105
                Hawaii Bar No. 9145
                Alan.alexander.beck@gmail.com


                /s/ *Stephen D. Stamboulieh*
                Stephen D. Stamboulieh
                Stamboulieh Law, PLLC
                P.O. Box 4008
                Madison, MS  39130
                (601) 852-3440
                stephen@sdslaw.us
                MS Bar No. 102784
                *\*Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

      I, Stephen D. Stamboulieh, hereby certifies that I caused to be filed a true and correct copy of the foregoing document or pleading, utilizing the Court's CM/ECF filing system, which generated a notice and sent a copy of the foregoing to all counsel of record, and I will cause to be served this, the First Amended Complaint, pursuant to the Federal Rules of Civil Procedure on the following Defendant which has not yet entered an appearance:

> Susan Ballard
> Chief of Police
> 801 S Beretania St
> Honolulu, HI 96813

Dated: Madison, Mississippi, May 21, 2018.

> /s/ *Stephen D. Stamboulieh*
> Stephen D. Stamboulieh
> Stamboulieh Law, PLLC
> P.O. Box 4008
> Madison, MS  39130
> (601) 852-3440
> stephen@sdslaw.us
> MS Bar No. 102784
> *Admitted Pro Hac Vice*
> Attorney for Plaintiff