IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANDREW NAMIKI ROBERTS, | CIVIL NO. CV18-00125 HG-RT |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 53] AND IN SUPPORT OF DEFENDANTS' CROSS- CLAIM |
| vs. | |
| RUSSELL SUZUKI, in his capacity as the Attorney General of the State of Hawaii, and AL CUMMINGS, in his Official Capacity as the State Sheriff Division Administrator, | |
| Defendants. | |

MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [ECF NO. 53] AND IN SUPPORT OF
DEFENDANTS' CROSS-CLAIM

## TABLE OF CONTENTS

Pages

Table of Authorities..................................................................................... i

I.     ARGUMENT ...................................................................................... 1

    1.     Electric Guns are Dangerous and Unusual Weapons ........................... 4

    2.     Hawaii's Electric Gun Statute Survives Intermediate
    Scrutiny ............................................................................................. 11

    3.     *Caetano v. Massachusetts* is Not Dispositive of this Case ............ 21

II.    CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

Pages

## CASES

Table of Authorities........................................................................... i

*Wright v. District of Columbia,*
    Case No. 1:16-cv-1556-JEB, Document 9-5
    (D.D.C. filed Aug. 8, 2016)..........................................................7

*Caetano v.Massachusetts,*
    136 S. Ct. 1027, 1033 (2016) ............................................... 8, 21

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................ 7, 12

*Hollis v. Lynch,*
    827 F.3d 436, 449 (5th Cir. 2016) .......................................... 11

*In re Branden O.,*
    94 Cal.Rptr.3d 520 (Cal. Ct. App. 2009) ................................. 17

*Jackson v. City & County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ................................... 3, 11, 12, 20

*James v. State,*
    521 S.E.2d 465 (Ga. Ct. App. 1999) ....................................... 17

*State v. Rivera,*
    716 S.E.2d 859 (N.C. Ct. App. 2011)....................................... 17

*United States v. Henry,*
    688 F.3d 637 (9th Cir. 2012) ............................................. 4, 10

*Wright v. District of Columbia,*
    Case No. 1:16-cv-1556-JEB, Document 9-5
    (D.D.C. filed Aug. 8, 2016).........................................................7

## STATUTES

Hawaii Revised Statutes § 134........................................................*passim*

<u>HAWAII SESSION LAWS</u>

Act 74, Session Laws of Hawaii, 1976 ...................................................... 12

Act 131, Session Laws of Hawaii, 2010 .................................................... 14

Act 144, Session Laws of Hawaii 2011 ..................................................... 15

Act 252, Session Laws of Hawaii, 2001,  ................................................. 13

Act 275, Session Laws of Hawaii, 1988  ................................................... 13

<u>OTHER</u>

DEFENDANTS RUSSELL A. SUZUKI AND AL CUMMINGS' (1)
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND (2) IN SUPPORT OF DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

Defendants Russell A. Suzuki and Al Cummings (collectively "Defendants"),

by and through their attorneys, Clare E. Connors, Attorney General of Hawaii, and

Caron M. Inagaki and John M. Cregor, Jr., Deputy Attorneys General, hereby submit

their opposition to Plaintiff's Motion for Summary Judgment as to Defendants

Russell A. Suzuki and Al Cummings. ECF No. 53, and in Support of Defendants'

Cross-Motion for Summary Judgment.

## I.    ARGUMENT

**Hawaii's Electric Gun Statute Does Not Violate the Second Amendment.**

Plaintiff challenges HRS § 134-16, which provides:

> **§134-16 Restriction on possession, sale, gift, or delivery of electric
> guns.** (a) It shall be unlawful for any person, including a licensed
> manufacturer, licensed importer, or licensed dealer, to possess, offer for sale,
> hold for sale, sell, give, lend, or deliver any electric gun.
>
> (b)    Any electric gun possessed, offered for sale, held for sale,
> sold, given, lent, or delivered in violation of subsection (a) shall be
> confiscated and disposed of by the chief of police.
>
> (c)    This section shall not apply to:
> (1)    Law enforcement officers of county police departments;
> (2)    Law enforcement officers of the department of public
>        safety;
> (3)    Conservation and resources enforcement officers of the
>        department of land and natural resources;
> (4)    Members of the Army or Air National Guard when
>        assisting civil authorities in disaster relief, emergency

779823_1

management, or law enforcement functions, subject to the requirements of section 121-34.5; and Vendors providing electric guns to the individuals described in paragraphs (1) through (4);

provided that electric guns shall at all times remain in the custody and control of the law enforcement officers of the county police departments, the law enforcement officers of the department of public safety, the conservation and resources enforcement officers of the department of land and natural resources, or the members of the Army or Air National Guard.

(d)     The county police departments of this State, the department of public safety, the department of land and natural resources, and the army and air national guard shall maintain records regarding every electric gun in their custody and control. The records shall report every instance of usage of the electric guns; in particular, records shall be maintained in a similar manner as for those of discharging of firearms. The county police departments, the department of public safety, the department of land and natural resources, and the army and air national guard shall annually report to the legislature regarding these records no later than twenty days before the beginning of each regular session of the legislature.

(e)     The department of land and natural resources and the department of public safety shall ensure that each of its conservation and resources enforcement officers and law enforcement officers who is authorized to use an electric gun and related equipment shall first receive training from the manufacturer or from a manufacturer- approved training program, as well as by manufacturer-certified or approved instructors in the use of electric guns prior to deployment of the electric guns and related equipment in public. Training for conservation and resources enforcement officers of the department of land and natural resources and law enforcement officers of the department of public safety may be done concurrently to ensure cost savings.

(f)     No later than June 30, 2018, the conservation and resources enforcement program of the department of land and natural resources shall meet the law enforcement accreditation or recognition standards of the Commission on Accreditation for Law Enforcement Agencies, Inc., in the use of electric guns.

"Electric gun" is defined in HRS § 134-1 as "any portable device that is electrically operated to project a missile or electromotive force. It does not include any electric livestock prod used in animal husbandry and any automatic external defibrillator used in emergency medical situations."[1]

The Ninth Circuit follows a two-step analysis for Second Amendment cases. *Jackson v. City & County of San Francisco,* 746 F.3d 953, 960 (9th Cir. 2014). "The two-step inquiry . . . '(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'" *Id.* In the first step, the question is "whether the challenged law burdens conduct protected by the Second Amendment based on a 'historical understanding of the scope of the Second Amendment right,' or whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Id.* (citations and brackets omitted). "If a prohibition falls within the historical scope of the Second Amendment, [the court] must then proceed to the second step of the Second Amendment inquiry to determine the appropriate

---

[1] For purposes of this case, "electric guns," "stun guns," and "Tasers" will be used interchangeably. "Taser" is the brand name of the most popular version of electric guns, which hold approximately 95% of the market. *See* Michael D. White & Justin Ready, *The Impact of the Taser on Suspect Resistance: Identifying Predictors of Effectiveness,* 56 Crime & Delinquency 70, 98 n.1 (2010) (attached as Exhibit "A").

level of scrutiny." *Id.* When ascertaining the appropriate level of scrutiny, the court considers: "(l) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.'  *Id.* at 960-61.  If a challenged law does not implicate a core Second Amendment right or does not place a substantial burden on the Second Amendment right, then intermediate scrutiny may be applied. *Id.* at 961.

## 1.    Electric Guns are Dangerous and Unusual Weapons.

The first step of the analysis turns on whether electric guns fall within the "dangerous and unusual weapons" exception.  *See United States v. Henry,* 688 F.3d 637, 639-40 (9th Cir. 2012).  If they fall within the exception, then they are not protected by the Second Amendment and the analysis ends. If they do not fall within the exception, then the analysis proceeds to the second step. A weapon falls within the dangerous and unusual weapons exception if it is "dangerous" and if it is not "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 640.

 Electric guns are "dangerous" because, even if they are less lethal than firearms, they can still cause death. According to a report by Reuters, 1,005 people have died in the United  States following encounters with police in which Tasers were used, from 1983 (the earliest mention of a fatality in which a Taser was used) through July 31, 2017.  Peter Eisler, Grant Smith & Jason Szep, *How Reuters*

*tracked fatalities and Taser incidents,* Reuters (Aug. 22, 2017), (attached as Exhibit "B"), updated to February 4, 2019 by Exhibit B-1.  In at least 153 of these cases, coroners or medical examiners cited the Taser as a cause or contributing factor in the death.  *Id.*  Wrongful death lawsuits were filed in at least 442 of the incidents.  *Id.*  Peer reviewed scientific studies indicate that Tasers can cause cardiac arrest.  Douglas P. Zipes, *TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans,* 129 Circulation 101 (2014), (attached as Exhibit "C"; Exhibit C-1 describes a man killed by a police Taser on King Street in front of Iolani Palace); Douglas P. Zipes, *Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device ,* 125 Circulation 2417 (2012), (attached as Exhibit "D").  In fact, in late 2009, as evidence of cardiac risks mounted, the manufacturer of Tasers – Taser International, Inc. (now known as Axon Enterprise, Inc.) issued a warning to avoid firing the electrified darts used in its devices at a person's chest.  Tim Reid, Peter Eisler & Jason Szep, *Special Report: As Tasers warns of more risks, cities bear a burden in court,* Reuters (Aug. 23, 2017), (attached as Exhibit "E").  The warnings changed from saying "aim at target: center of mass or legs" and "aiming at open front of unzipped jacket" to saying "[w]hen possible, avoid chest shots[.]" Zipes (2014), at 104; *Training Bulletin 15.0 Medical Research Update and Revised*

*Warnings,* Taser International, Inc., at 2 (Release Date: 10/12/2009), (select "2008-2009") (attached as Exhibit "F").

Furthermore, electric guns are dangerous in a way that is unique to them, and which is not shared by ordinary firearms. Electric guns, when used improperly and without adequate controls, can be used as instruments of torture. As reported by the Washington Post:

> Tasers are best known for their ability to incapacitate individuals while use in "probe mode," when they fire two barbs that deliver an electric current along wires, causing the muscles to lock up. When placed against a person's body in "drive stun" mode, . . . Tasers do not incapacitate but cause localized pain that can be used to control dangerous individuals.  Pain compliance, police call it.

Cheryl W. Thompson & Mark Berman, *Improper Techniques, Increased Risks,* Washington Post (Nov. 26, 2015), (attached as Exhibit "G"). The United Nations and Amnesty International have called the excessive use of Tasers a form of torture. The U.N. Committee Against Torture and the U.N. Special Rapporteur on Torture have both criticized the use of Tasers and called for investigations. *U.N.: Tasers Are A Form Of Torture,* **CBS** News (Nov. 25, 2007), (attached as Exhibit "H"); Stephanie Nebehay & Jason Szep, *Exclusive: U.N. watchdogs call for probe of Taser assaults in U.S. jails,* Reuters (Dec. 7, 2017), (attached as Exhibit "I"). Amnesty International has stated that so-called less-lethal weapons, such as electric guns, have been misused for torture. *'Less-lethal' weapons can kill*

*and police misuse them for torture,* Amnesty International (April 13, 2015),
(attached as Exhibit "J").

Therefore, even if electric guns are ordinarily less lethal than firearms when
properly used, they can still cause death, and they are additionally dangerous in a
different way (as instruments of torture), when used improperly.

As for whether electric guns are "unusual," they are indeed unusual
because they are not "typically possessed by law-abiding citizens for lawful
purposes." Clearly, electric guns are not used for target shooting or hunting.
They are not suitable at all for such purposes and no person would even
suggest using them in those ways. But electric guns are also not "typically"
used for the remaining "lawful" purpose – self-defense. Although most states
permit civilians to own electric guns, they are more popularly used by law
enforcement. Electric guns are, in essence, *offensive* weapons used by trained
law enforcement personnel *to subdue uncooperative suspects* rather than
weapons used for "defense of hearth and home." *See District of Columbia v.
Heller,* 554 U.S. 570, 634 (2008).

According to a declaration by Mark W. Kroll, a director of Taser
International, Inc. (now known as Axon Enterprise, Inc.), approximately *850,000*
Tasers have been sold to more than 18,000 law enforcement, private security,

779823_1                                        7

and military agencies.  Declaration of Dr. Mark Kroll (Exhibit 4), *Wright v. District of Columbia,* Case No. 1:16-cv-1556-JEB, Document 9-5, at Cl[ 5 (D.D.C. filed Aug. 8, 2016) (attached as Exhibit "K"). *See also* Rich Smith, *Is the Market for TASER's Tasers Tapped Out?,* The Motley Fool (Sept. 27, 2016), ("According to TASER's own figures, 'more than 850,000 TASER weapons have been sold since 1994[.]'") (attached as Exhibit "L"). However, only **275,000** civilian Tasers have been sold to the general public.  Kroll Declaration, ¶ 5. *See also Caetano v.Massachusetts,* 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring) ("'approximately 200,000 civilians owned stun guns' as of 2009"). Therefore, electric guns are not "typically" a weapon used by the public for "defense of hearth and home." Instead, they are "typically" used by law enforcement to subdue suspects.

Axon's own filings with the Securities and Exchange Commission ("SEC") further support this point. Axon's most recent Form 10-K filed with the SEC states: "Our **primary target market** for both our weapon and video[2] products is federal, state and local law enforcement agencies in the U.S. and

---

[2] Axon also sells police body cameras and associated software. In fact, the name "Axon" was originally the brand name for the company's body cameras. In 2017, Taser International changed its name to Axon because Axon is a less "polarizing" brand. Stephen Nellis, *Taser changes its name to Axon in shift to software services,* Reuters (April 5, 2017), (attached as Exhibit "M").

throughout the world." *SEC Form 10-K,* Axon Enterprise, Inc., at 8 (FY ending Dec. 31, 2017), (emphasis added) (attached as Exhibit "N"). However, "CEWs [Conducted Electrical Weapons] have gained *limited* acceptance in the private citizen market. These devices primarily compete with guns, but also with other less lethal weapons such as pepper spray. The primary competitive factors in the private citizen market include a weapon's cost, effectiveness, safety and ease of use." *Id.* at 10 (emphasis added). In discussing the "risk factors" faced by the company, Axon stated: "We are ***materially dependent on acceptance of our products by law enforcement markets,*** both domestic and international. If law enforcement agencies do not continue to purchase and use our products, our reserves will be adversely affected." *Id.* at 13 (emphasis added). Axon's statistics further confirm that private citizens make up a very small portion of their customers. Axon currently sells two Taser models to law enforcement and the military – the X26P and the X2. *Id.* at 7. Axon has two Tasers models for private consumers –the Pulse and the Bolt. *Id.* For 2017, sales of the X26P accounted for 18.7% of net sales, and sales of the X2 accounted for 23.7% of net sales, for a total of ***42.4% of net sales. Id.*** at 29. The Pulse and the Bolt, together, accounted for only ***1.3% of net sales. Id.***

The figure of 275,000 civilian Tasers is also·small when compared to the

total population of the United States, which is 327 million.  *Population on a Date,*

U.S. Census Bureau (as of April 29,  2018),  (attached as Exhibit "O"). Furthermore,

there are an estimated 310 million guns in the United States. William J. Krouse,

*Gun Control Legislation,* Congressional Research Service, at 8 (Nov. 14, 2012),

(attached as Exhibit "P").  This means that there is approximately one gun per

person in this country. *Id.* at 9.  In comparison, 275,000 electric guns in civilian

hands is miniscule.

The figures for electric guns are actually more comparable to the figures for

machine guns.  Machine guns represent the classic "dangerous and unusual

weapon." *See Henry,* 688 F.3d at 639-40. Machine guns are "unusual" because

private possession of machine guns was outlawed in 1986, except for those that

were lawfully possessed when 18 U.S.C. § 922(0) was enacted on May 19, 1986.

*Henry,* 688 F.3d at 640.  Nevertheless, according to data from the Bureau of

Alcohol, Tobacco, and Firearms ("ATF"),  there are 630,019 machine guns

registered under the National Firearms Act in the United States.  *Firearms*

*Commerce in the United States,* Bureau of Alcohol, Tobacco, and Firearms (2017),

(attached as Exhibit "Q").

Although most of the machine guns in the ATF figure are probably held by law

enforcement agencies, some of them were privately-owned prior to 1986.

According to an ATF response to a Freedom of Information Act request, it appears that 175,977 machine guns that were privately-owned prior to 1986 remain in civilian hands. Letter from Stephanie M. Boucher, Bureau of Alcohol, Tobacco, and Firearms (Feb. 24, 2016), (attached as Exhibit "R"). The Fifth Circuit has also held, in applying the dangerous and unusual weapons exception to machine guns, that "there are 175,977 pre-1986 civilian-owned machineguns in existence." *Hollis v. Lynch,* 827 F.3d 436, 449 (5th Cir. 2016). If 175,977 machine guns in civilian hands is "unusual" for purposes of the dangerous and unusual weapons exception, 275,000 Tasers in civilian hands should be considered "unusual" as well. The figures are close, both amounting to a couple hundred thousand, in comparison to the hundreds of millions of actual firearms that are possessed by civilians. If machine guns are sufficiently "unusual" to satisfy the exception, electric guns should be sufficiently "unusual" too.

For these reasons, electric guns are "dangerous and unusual weapons" and are not protected by the Second Amendment.

**2.  Hawaii's Electric Gun Statute Survives Intermediate Scrutiny.**

Even if this Court decides that the dangerous and unusual weapons exception does not apply to this case, intermediate scrutiny should apply and

HRS § 134-16 would survive intermediate scrutiny.

The "core" of the Second Amendment is self-defense within the home. *Jackson,* 746 F.3d at 963-64. However, as noted above, electric guns are not typically used for self-defense within the home. Instead, they are more commonly used as offensive weapons by law enforcement to subdue unruly suspects. A total of 850,000 Tasers have been sold to law enforcement agencies and the military, while only 275,000 Tasers have been sold to civilians. A total of 42.4% of Axon's net sales are for law enforcement and military Taser models, while only 1.3% of net sales are for civilian models. Clearly, electric guns are not a "quintessential self-defense weapon" like handguns. *See Heller,* 554 U.S. at 629. Since electric guns do not implicate the "core" of the Second Amendment, intermediate scrutiny applies. Intermediate scrutiny requires: "(l) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Jackson,* 746 F.3d at 965.

Hawaii's electric gun statute was originally enacted in 1976. Act 74, 1976 Haw. Sess. Laws Act 74, §§ 1-4 at 100 (attached as Exhibit "S"). Codified as HRS § 134-17, this provision made it "unlawful for any person . . . to possess, offer for sale, hold for sale, sell, give, loan, or deliver to another any electric gun." HRS §

134-17 (1976) (attached as Exhibit "T").  Although the House proposed an

exception for police officers, no exception made it to the final bill. *See* H. Stand.

Comm. Rep. No. 410-76, in 1976 House Journal, at 1456 (attached as Exhibit "U").

Clearly, the Legislature felt so strongly that electric guns were dangerous that they

did not even allow an exception for police officers. As stated in the Senate

committee report:

> The Police Department of the City and County of Honolulu testified before your Committee to the effect that an "electric gun" is presently available which is capable of firing a missile that may emit up to 50,000 volts. Your Committee finds that such an instrument is detrimental to the safety and well-being of the general public.

S. Stand. Comm. Rep. No. 619-76, in 1976 Senate Journal, at 1153 (attached as

Exhibit "V"). **HRS** Chapter 134 was reorganized in 1988 and **HRS §** 134-17 was

renumbered as **HRS §** 134-16 without substantive change. Act 275, 1988 Haw.

Sess. Laws Act 275, §§ 1-6 at 510-17 (attached as Exhibit "W").

In 2001, the Legislature added an exception for "law enforcement officers of

the county police and sheriff departments of this State, or vendors[.]" Act 252,

2001 Haw. Sess. Laws Act 252, § 3 at 651-52 (attached as Exhibit "X").  But  the

Legislature also included requirements that the "electric guns shall at all times

remain in the custody and control" of the police and sheriff departments. *Id.*

The Legislature also required the police and sheriff departments to "maintain

records regarding every electric gun in their custody and control[,]" "report

every instance of usage of the electric guns[,]" ordered that the records "be maintained in a similar manner as for those of discharging of firearms[,]" and directed them to "annually report to the legislature regarding these records[.]" *Id.* The House initially wanted to limit each county police department to only three electric guns during a testing period. H. Stand. Comm. Rep. No. 561, in 2001 House Journal, at 1346 (attached as Exhibit "Y"). However, testimony from the Honolulu Police Department indicated that electric guns had been extensively tested and successfully deployed in many mainland police departments; therefore, there was no need for a testing period. S. Stand Comm. Rep. No. 1555, in 2001 Senate Journal, at 1550 (attached as Exhibit "Z").

In 2010, the Legislature expanded the exception to allow law enforcement officers of the Department of Public Safety and the Department of Land and Natural Resources to use electric guns. Act 131, 2010 Haw. Sess. Laws Act 131, §1-3 at 275 (attached as Exhibit "AA"). However, the Legislature required the officers "authorized to use an electric gun" to "first receive training from the manufacturer or from a manufacturer-approved training program, as well as by manufacturer-certified or approved instructors[.]" *Id.* The Legislature also required accreditation from national authorities in the use of electric guns. *Id.* The Legislature emphasized that the bill "requires these officers to receive training in

the use of electric guns[.]" Conf. Comm. Rep. No. 59-10, in 2010 Senate Journal, at 737 (attached as Exhibit "BB"); H. Stand. Comm. Rep. No. 1211-10, in 2010 House Journal, at 144l(attached as Exhibit "CC"). The Legislature also emphasized that electric guns were intended to "provide a viable alternative to the escalation of the use of deadly force when dealing with non-compliant combative suspects[.]" Conf. Comm. Rep. No. 59-10, in 2010 Senate Journal, at 737; S. Stand. Comm. Rep. No. 2295, in 2010 Senate Journal, at 920 (attached as Exhibit "DD"); S. Stand. Comm. Rep. No. 2562, in 2010 Senate Journal, at 1025 (attached as Exhibit "EE").

In 2011, the Legislature added an exception for members of the Army and Air National Guard when assisting civil authorities in disaster relief, civil defense, or law enforcement functions. Act 144, 2011 Haw. Sess. Laws Act 144, § 3 at 361-62 (attached as Exhibit "FF"). The bill specifically cross-referenced and added a new **HRS §** 121-34.5, which required the National Guard members to be "qualified by training and . . . authorized by their commanders" to use electric guns. Act 144, § 2 at 361. The training has to be "provided or authorized by the manufacturer or is manufacturer-approved or is an electric gun training program approved by the army or air national guard[.]" *Id.* The Legislature emphasized: "Your Committee notes that this measure requires training and specific command authorization for each individual member authorized by this measure to possess and use an electric gun." S. Stand. Comm. Rep. No. 1222, in 2011 Senate Journal,

15

at 1318 (attached as Exhibit "GG").[3]

  The legislative history of HRS § 134-16 indicates that the Legislature was very concerned about how dangerous electric guns were. They noted that electric guns are capable of delivering 50,000 volts and found them to be "detrimental to the safety and well-being of the general public." Thus, the Legislature was clearly concerned about the possible misuse of electric shock and found it to be dangerous. The Legislature was initially reluctant to allow police officers to use electric guns and even considered limiting each county police department to three electric guns.  Eventually, the Legislature did create exceptions for law enforcement officers and Army and Air National Guard members, but they also imposed significant requirements on them.  The Legislature imposed record keeping and reporting requirements as well as

---

[3] **HRS § 121-34.5** currently provides:

  Members of the army or air national guard who have been qualified by training and are authorized by their commanders may use electric guns, as specifically provided in section 134-16(c) and (d), when assisting civil authorities in disaster relief, emergency management, or law enforcement functions; provided that "training" for the purposes of this section means a course of instruction or training in the use of any electric gun authorized pursuant to this section, that is provided or authorized by the manufacturer or is manufacturer-approved or is an electric gun training program approved by the army or air national guard, prior to deployment or issuance of electric guns and related equipment.

extensive training and accreditation requirements. The Legislature also required State law enforcement officers to be "authorized" and National Guard members to be "authorized by their commanders[.]"

The government's objective behind HRS § 134-16 was "significant, substantial, or important[.]" The government's objective was to protect the "safety and well-being of the general public" by preventing a potentially dangerous device, capable of delivering a severe electric shock, from harming members of the public if used improperly. **HRS §** 134-16 represents "a reasonable fit between the challenged regulation and the asserted objective" because the various exceptions added throughout the years tailored the risk presented by electric guns to those persons best able to handle those risks. Use of electric guns is limited to trained law enforcement and National Guard personnel. Not only that, but those personnel must be specifically "authorized" by their superiors to use electric guns. If they violate the orders and authorization of their superiors, they will be subject to disciplinary proceedings within their agencies. In contrast, allowing any civilian to use electric guns invites abuse. Civilians will not be adequately trained, nor will they be subject to sufficient controls to prevent abuse.[4]

_____

[4] Electric guns have been used to commit crimes in states that permit civilian

779823_1

17

The current warnings issued by Axon indicate how much training is required in order to operate a Taser safely. *TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement ,* Axon Enterprise, Inc. (May 19, 2017), (attached as Exhibit "HH"). The warnings are 7 pages long and address all kinds of situations. They warn the user: "Do not use or attempt to use any CEW [Conducted Electrical Weapon] model unless you have been trained by a Certified TASER Instructor on that particular model." *Id.* at 1. They warn that "[r]epeated, prolonged, or continuous CEW application may contribute to cumulative exhaustion, stress, cardiac, physiological, metabolic, respiratory, and associated medical risks which could increase the risk of death or serious injury. Minimize repeated, continuous, or simultaneous exposures." *Id.* They warn about cardiac capture, in which CEW exposure induces extra heart beats, which can lead to cardiac arrest. *Id.* at 2. They warn that the preferred target areas, to reduce cardiac risk, are below the neck for back shots and the lower center of mass (below the chest) for front shots. *Id.* at 3. They warn about targeting sensitive areas, such as the face, eyes, head, throat, chest area, breast,

---

ownership. *See, e.g., State v. Rivera ,* 716 S.E.2d 859 (N.C. Ct. App. 2011) (civilian used stun gun in robbery); *In re Branden O.,* 94 Cal.Rptr.3d 520 (Cal. Ct. App. 2009) (civilian juvenile used stun gun in assault); *James v. State,* 521 S.E.2d 465 (Ga. Ct. App. 1999) (civilian used stun gun in robbery).

groin, genitals, or known pre-existing injury areas. *Id.* They warn against targeting higher risk populations, such as pregnant women, the infirm, the elderly, low body-mass index persons, or small children. *Id.* They warn about secondary injuries caused by falling after being shot. *Id.* They warn about CEWs inducing seizures, fainting, muscle contraction, incapacitation, or startle response. *Id.* They warn about providing medical care, especially after injury to sensitive areas. *Id.* at 4. They warn about safe handling of the CEW, including confusing your handgun with the CEW and safe storage. *Id.* at 5.  They warn that if the subject is not incapacitated, an ineffective CEW application could increase the risk of death or serious injury to the user, the subject, or others. *Id.* They warn that the subject might not be fully incapacitated or might recover quickly. *Id.* at 6. But they also warn that the drive-stun mode is used for pain compliance only and does not generally cause incapacitation. *Id.* And they warn about maintenance problems for the CEW.  *Id.* at 7.

Hawaii is not arguing that electric guns are inherently unsafe and should not be used by anyone. To the contrary, Hawaii still wants authorized state and local law enforcement officers and National Guard members to be able to use electric guns consistent with their training. Electric guns are safe when properly used by people who are properly trained.  As reported by the Washington Post:

779823_1                              19

> Deaths after Taser usage by police are relatively rare, accounting for a fraction of the people who die during or after encounters with officers, according to a comprehensive study by the National Institute of Justice. Research shows that when used correctly, the devices are generally safe and prevent injuries to both police officers and civilians. But when Tasers are used excessively or if officers don't follow department policy or product guidelines, the risk of injury or death can increase, according to company product warnings and police experts.

Thompson & Berman, at 2. Therefore, Hawaii wants to limit electric guns to those who are properly trained and are qualified to use them. **HRS § 134-16** does not represent a mindless blanket ban on civilian ownership of electric guns.  Rather, it represents narrow tailoring that matches the qualifications of the operator to the risks associated with the device. In other words, the State's "significant, substantial, and important" interest in preventing electric guns from being misused in a manner that results in harm to members of the public "reasonably fits" the limitations that allow only those persons who are well trained and subject to proper controls to possess  and use them.[5] *See Jackson,* 746 F.3d at 965.

Although Plaintiff might argue that Hawaii should impose training requirements on civilians rather than ban ownership, civilian training would

---

[5] Even if this Court decides that intermediate scrutiny does not apply, HRS § 134- 16 would also survive strict scrutiny. The safety and well-being of the public is strong enough to constitute a compelling state interest. And the legislative history of HRS § 134-16 reflects narrow tailoring.

still be inadequate. People who participate in training as a job requirement have a greater incentive to take it seriously than people who do not. Moreover, since, as reflected in the warnings, Taser training primarily protects the person who is shot rather than the operator, a civilian would tend to be less attentive to the training. A law enforcement officer, on the other hand, would still take the training seriously because his or her career could be adversely affected if a suspect dies while in custody. A law enforcement officer would also be subject to internal affairs investigations and possible discipline if an electric gun is misused or training ignored.  Civilians would not be subject to such controls. Law enforcement officers could also be required to participate in further training as needed, while civilians would likely only be subject to an initial training when the electric gun is purchased. Given the risks presented by electric guns, it still makes more sense to limit them to trained and authorized law enforcement personnel.

### 3.    *Caetano v. Massachusetts* is Not Dispositive of this Case.

Plaintiff relies on the U.S. Supreme Court's decision in *Caetano  v. Massachusetts,* 136 S. Ct. 1027 (2016) (per curiam), to argue that **HRS §** 134-16 violates the Second Amendment. However, the per curiam opinion is actually very narrow.   It merely rejects the reasoning of the Massachusetts Supreme Judicial

779823_1

Court. The Massachusetts court gave three reasons why the Second Amendment does not extend to stun guns:  (1) stun guns "were not in common use at the time of the Second Amendment's enactment"; (2) stun guns are "unusual" because they are "a thoroughly modem invention"; and (3) stun guns are not "readily adaptable to use in the military." *Id.* at 1027-28. The per curiam opinion rejected all three reasons. However, Hawaii's arguments in support of **HRS** § 134-16 do not rely on these arguments. Furthermore, Justice Alito's concurring opinion only had the support of himself and Justice Thomas. Therefore, it is obiter dictum and not binding.

## II.     CONCLUSION

For the foregoing reasons, **HRS** § 134-16 does not violate the Second Amendment.  Plaintiff's Motion for Summary Judgment should be denied and Defendants' Cross Motion for Summary Judgment should be granted.

DATED:  Honolulu, Hawaii,  September 4, 2019.


      /s/  John M. Cregor
JOHN M. CREGOR, JR.
Deputy Attorney General

Attorney for Defendants
CLARE E. CONNORS and AL
CUMMINGS, In Their Official Capacities